## 3899. RICKERSON *v.* THE STATE.

1. The evidence, taken in connection with the prisoner's statement, fully authorized a conviction of voluntary manslaughter.
2. When the State proves that the accused killed the person named in the indictment, in the county and in the manner therein described, a prima facie case of murder is made out. The evidence in the present case warranted an instruction to this effect.
3. The evidence authorized a finding that the homicide was committed in Jasper county.
4. The charge was full and fair. Any inaccuracies in reference to the law of murder were harmless. The requests to charge, so far as legal and pertinent, were covered by the general charge, which was free from prejudicial error. The evidence warranted the verdict.

DECIDED JANUARY 30, 1912.

Conviction of manslaughter; from Jasper superior court—Judge J. B. Park. November 23, 1911.

*W. S. Florence,* for plaintiff in error.

*J. E. Pottle, solicitor-general,* contra:

POTTLE, J. Rickerson was indicted for the murder of Moseley and convicted of voluntary manslaughter. His motion for a new trial was overruled, and he sued out a writ of error to this court.

He contends that neither under the evidence nor under the statement of the accused can a verdict of manslaughter be justified—that he is guilty of murder, or not guilty of any offense.

1. It would serve no good purpose to enter into a long discussion of the evidence. Suffice it to say that the jury could have found that both men were drunk and ready to fight; that Moseley indicated a willingness to fight and threatened to kill the accused unless he took another drink; that Rickerson left Moseley, went to a near-by buggy, got a pistol, returned to Moseley, who was sitting in his buggy, and then both began shooting at about the same time. This theory brings the case squarely within the ruling made in *Gann* v. *State,* 30 *Ga.* 67, and cases of kindred nature. The judge fairly presented this theory of the case, and there was no prejudicial error in his instructions on the subject.

2. The court charged, in effect, that when the State shows the killing, the burden is shifted to the accused, to mitigate or justify it. This is unquestionably the law, and the charge was warranted by the evidence. The State relied partly upon proof of incriminating admissions by the accused. While some of the witnesses testified that exculpatory statements were coupled with the admissions, one witness testified to a bald confession without any attempt at justification. It makes no difference how a killing be shown; when once proved, a prima facie case of murder is made for the State, unless, of course, it is made to appear at the same time that the killing is justifiable, or a lower grade of homicide has been committed. Whenever such a prima facie case is made, the burden is on the accused to set up his defense. This is what the trial judge charged, and his language was so guarded as not to prejudice the accused.

3. Complaint is made in the motion for a new trial that the venue of the offense was not proved. Kelly and Farrar are two railroad stations about two miles apart in the northern part of Jasper county, Kelly being south of Farrar. There is also a public road between these two villages. The accused lived on this public road, and a witness named Spearman also lived on it, about four hundred yards from the accused. Spearman testified: "My house and the house where Rickerson lived is on the same road, but on different sides of the road. It is level from Rickerson's house for about fifty or one hundred yards, then you go down grade, a hill, and then up a pretty good hill and down a long hill to my

30

house." Newborn is a town about on the line between Newton and Jasper counties. Cranford, who was jointly indicted with Ricker- son, lived northeast of Farrar. On the day of the homicide the de- ceased went in his buggy to the home of the accused and persuaded the accused to go with him to arrest a negro. Before going to make the arrest they drove northward to Newborn, where the accused had some business to transact. Remaining there awhile, they got in the buggy and started back southward to go to the negro's house. They remained at this house about three hours, and effected a settle- ment with the negro. After leaving the negro's house they made several stops along the way, and finally, in the language of the ac- cused, "We trotted on and got next to Guy Spearman's. We struck another trot to the other slant, and just as we got on top of the rise there near the cotton-patch, he said, 'Let's take another drink.'" It was at this point the shooting took place. Cranford came up just before the shooting and left shortly afterwards. Guy Spear- man testified that in going from Rickerson's house to where Cran- ford lives, you would travel north and northwest and go through Farrar. "This is the way you would travel if you went *from the scene of the homicide* to Cranford's." He further testified, that he and his wife were at their home on the night of the homicide and heard four or five pistol-shots; that after a little while he saw a buggy come over the hill, and, in about a minute or two, a man came running over the hill and got into the buggy, nearly in front of his house, and drove on towards Farrar. The circumstances in- dicate that this man was Cranford. The witness said that he heard "hollering" in the direction of Kelly, seemingly in the same di- rection as the firing of the pistol. The man who got in the buggy came from towards Kelly and Rickerson's home. "This I have just told the jury was in this county and State." Also: "I will state that the point that I heard the pistol-shots fire was in Jasper county, Georgia." Mrs. Spearman testified that "it was in the direction towards Kelly that I heard hollering, and the pistol-shots were in the same direction." Another witness for the State testified that he heard the pistol-shots, and shortly afterwards saw Cranford coming from towards Kelly, "from the direction in which I heard the pistol-shots." We are clear that, taking all this evidence to- gether, in connection with the statement of the accused, the jury were authorized to find that the homicide occurred in Jasper county.

4. There are numerous assignments of error upon the court's charge. Many of them complain of instructions in reference to the law of murder. None of the assignments are meritorious. The instructions seem to be free from error, but even if they contain inaccurate statements, the accused was convicted of voluntary manslaughter, and was not prejudiced in any way by the charges upon the law of murder. The requests, in so far as they were legal and pertinent, were fully covered by the general charge, which was free from substantial error. The accused had a fair and impartial trial, and we find nothing in the record which would authorize interference by this court.

*Judgment affirmed. Russell, J., dissents.*